United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERGIO BETANCOURT,<br>Plaintiff,<br>v.<br>MERCEDES-BENZ USA, LLC,<br>Defendant. | Case No. 22-cv-05898-RS<br><br>**ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |

Sergio Betancourt is the owner of a 2015 Mercedes-Benz C300. In 2022, he presented the vehicle for repairs at a Mercedes-Benz service center in Ontario, California. The service center determined that the cylinder 1 engine piston was cracked, causing white smoke to billow out of the exhaust. Repair of the piston was not covered by the vehicle's warranty.

Betancourt filed this lawsuit, claiming that Mercedes-Benz was required to cover the cost of the repair under California's Emission Control System Warranty Regulations (the "Warranty Regulations"). *See* Cal. Code Regs. tit. 13 § 2035–41. His lawsuit faces several fatal impediments. First, he seeks restitution, declaratory relief, and injunctive relief, but there are jurisdictional problems with all three remedies. As to restitution, Betancourt has not successfully averred that he lacks an adequate remedy at law, precluding equitable jurisdiction under principles of federal common law. *See Sonner v. Premier Nutrition Corp.,* 971 F.3d 834, 844 (9th Cir. 2020). As to the two forms of prospective relief, Betancourt has not demonstrated that he faces the threat of an actual, imminent injury, so he lacks Article III standing.

Betancourt's claim fails on the merits as well. The Warranty Regulations require vehicle

manufacturers to warrant "high-priced warranted parts" for seven years or 70,000 miles, whichever comes first. *See id.* § 2037(b)(3), (c). The piston falls outside the definition of a "warranted part" (and, *a fortiori*, outside the definition of a "high-priced warranted part") because it is not "installed *on* a motor vehicle or motor vehicle engine." *Id.* § 2035(c)(3)(B) (emphasis added). It is, instead, an integral part *of* the motor vehicle engine. Mercedes-Benz thus had no obligation to cover it under the warranty. For these reasons, and because the motion is granted on threshold jurisdictional issues, the grant of the motion is without prejudice.

## I. BACKGROUND

Sergio Betancourt owns a 2015 Mercedes-Benz C300. By January 28, 2022, Betancourt's vehicle had amassed 51,672 miles, and it started experiencing problems. He brought it to the service center at Mercedes-Benz of Ontario in Ontario, California, where a crack in the engine's piston was discovered. Repair of the piston was not covered by the vehicle's warranty, so Betancourt paid several thousand dollars out-of-pocket for the repair.

Betancourt sought reimbursement for the cost of the repair from Mercedes-Benz, but it maintained that the piston was not covered by the vehicle's warranty and that the lack of coverage was consistent with California law. Betancourt then sued. On behalf of himself and a putative class of individuals who own vehicles subject to the same warranty, Betancourt averred that Mercedes-Benz's warranty policy violated the Warranty Regulations, which require it to warrant certain high-priced parts for 7 years or 70,000 miles, whichever comes first. In Betancourt's view, Mercedes-Benz's failure to warrant its engine pistons violates the unlawful, unfair, and deceptive prongs of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* He seeks restitution of the costs paid for the repairs, an injunction requiring Mercedes-Benz to warrant engine pistons going forward, and a declaration stating that Mercedes-Benz's ongoing failure to warrant the engine piston violates the Warranty Regulations.

Mercedes-Benz has moved to dismiss. Its frontline position is that it was under no obligation to warrant the engine piston because it is not a "warranted part" within the meaning of the Warranty Regulations, much less "high-priced warranted part." Should that argument fail,

Mercedes-Benz offers plenty of backups. It contends that the complaint, despite sounding in fraud, fails to satisfy the heightened pleading requirements of Rule 9(b), that California's consumer-protection laws should not be extended to out-of-state owners and lessees, and that its request for equitable relief is both too broad and disallowed by principles of federal equity jurisdiction.

## II. LEGAL STANDARD

Mercedes-Benz moves to dismiss under Federal Rule of Civil Procedure 12(b)(6), which permits dismissal for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A Rule 12(b)(6) motion tests the legal sufficiency of the claims—that is, taking all the well-pleaded averments in the complaint as true and drawing all reasonable inferences in favor of the non-moving party, it "ask[s] whether the facts are sufficient to state a claim to relief that is plausible on its face." *Bodenburg v. Apple Inc.*, 146 F.4th 761, 767 (9th Cir. 2025). Though jurisdictional defects can be raised in a motion to dismiss, they may also be identified sua sponte by the district court. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) ("[C]ourts . . . have an independent obligation to determine whether subject-matter jurisdiction exists, even in the absence of a challenge from any party.").

## III. DISCUSSION

### A. Equitable Jurisdiction over Restitution

Though Mercedes-Benz's motion to dismiss focuses on the merits of Betancourt's claim, it is necessary to begin with its argument that Betancourt has an adequate remedy at law. Betancourt has advanced only a claim under the UCL, which "provides only for equitable remedies." *Hodge v. Superior Ct.*, 145 Cal. App. 4th 278, 284, 51 Cal. Rptr. 3d 519, 523 (2006). Under principles of federal common law—which apply when, as here, a federal court is sitting in diversity—a plaintiff cannot obtain an equitable remedy if he has available an adequate remedy at law. *See Sonner*, 971 F.3d at 844. The availability of an adequate legal remedy—and thus the presence of federal equitable jurisdiction—is a threshold issue. *See Guzman v. Polaris Industries Inc.*, 49 F.4th 1308, 1314 (9th Cir. 2022); *Schlesinger v. Councilman*, 420 U.S. 738, 753–54 (1975).

As noted, Betancourt's operative complaint seeks three forms of relief: restitution,

injunctive relief, and declaratory relief. Betancourt is requesting restitution to cover the out-of-pocket expenses spent fixing the engine in his vehicle. Those expenses are perfectly recoverable through damages, which would put Betancourt back in the position he was in before Mercedes-Benz's (alleged) violation—that is, with the money back in his wallet.

Betancourt offers three reasons why damages are inadequate, but none work. First, he argues that damages and restitution are distinct remedies serving distinct purposes. The former seeks to compensate victims that are injured by a wrongdoer's actions; the latter is intended to prevent the wrongdoer from profiting from his illegal acts. That is true, but it proves far too little. If the mere fact that two remedies have different objectives were enough to render the legal remedy inadequate, the inadequate remedy at law doctrine would be a nullity, for every remedy has a unique origin and objective. The dispositive question is whether *in this case*, damages suffice to remedy fully the harm for which the plaintiff seeks restitution. When the amount of money available under the two remedies is the same, the answer is yes. *See Sonner*, 971 F.3d at 844 (concluding that damages were adequate, and therefore that the plaintiff could not seek restitution under the UCL, where she sought the "same amount of money for the exact same harm"). The sum sought will *both* put the plaintiff in the position he would have been in absent the challenged conduct *and* prevent the defendant from profiting from that conduct, rendering restitution unnecessary.

Second, Betancourt contends that damages are inadequate because it is easier to establish a claim under the unlawful prong of the UCL than it is to establish entitlement to damages under the California Legal Remedies Act (CLRA). To substantiate his claim that a legal remedy is inadequate when it is more difficult to obtain than is the comparable equitable remedy, Betancourt relies on *American Life Insurance Co. v. Stewart*, 300 U.S. 203, 210 (1937). That case involved two life insurance policies which contained terms making them incontestable two years after their issuance. *See id.* at 210. The insured died shortly after the policies issued. The insurer then came to believe that the insured made fraudulent misrepresentations concerning his health in his policy application, so it sued in equity, seeking cancellation of the policies. The district court found for

the insurer and cancelled the policies, but the Tenth Circuit reversed, concluding that the insurer had an adequate remedy at law. Namely, the insurer could have waited for the beneficiary to seek benefits under the policy, refused to pay, and then asserted fraudulent procurement as a defense in an ensuing suit at law. Reversing, the Supreme Court explained that forcing the insurer to wait for a claim of benefits and then a follow-on suit would carry too great a risk. *See Stewart*, 300 U.S. at 214–15. If the beneficiary did not claim benefits until the two-year clock had run, the policy would become incontestable, and the insurer would have no recourse. *See id.* at 212. Accordingly, the Court held that "an insurer, who might otherwise be condemned to loss through the mere inaction of an adversary, may assume the offensive by going into equity and there praying cancellation." *Id.*

In delineating its holding, the Supreme Court remarked that "[a] remedy at law does not exclude one in equity unless it is equally prompt and certain and in other ways efficient," *Stewart*, 300 U.S. at 214, but that statement cannot bear the weight Betancourt places on it. The plaintiff in *Stewart* faced several substantial procedural hurdles to obtaining legal relief, most notably he had to rely on the beneficiary to bring a claim. *See Bank of Kentucky v. Stone*, 88 F. 383, 391 (C.C.D. Ky. 1898), *aff'd,* 174 U.S. 799, (1899) ("The remedy at law cannot be adequate if its adequacy depends upon the will of the opposing party."). By contrast, Betancourt is free to seek legal relief right now. In fact, he did just that in his original complaint before dropping the CLRA claim in his amended complaint. It may be that, under *Stewart*, extraordinary impediments to securing legal relief render the legal remedy inadequate, but it does not follow that any extra showing required to make out a claim at law, no matter how marginal, yields the same result.

Ninth Circuit precedent in the wake of *Sonner* also cast doubt on Betancourt's position. In *Key v. Qualcomm Inc.*, a class of plaintiffs sued Qualcomm, a manufacturer of cellular modem chips, under various antitrust theories, including that Qualcomm had "exclusive dealing arrangement[s]" with Samsung and Apple. *See* 129 F.4th 1129, 1137–38 (9th Cir. 2025). The plaintiffs sought treble damages (a legal remedy) under the Cartwright Act, but their Cartwright Act claim did not survive summary judgment. *See id.* at 1137. On appeal, the Ninth Circuit held

that the plaintiffs could not seek equitable restitution under the UCL because the Cartwright Act provided an adequate remedy at law. *See id.* at 1142. The availability of treble damages, the panel explained, was "hardly an inadequate remedy," and the plaintiffs' "failure to prove their Cartwright Act claim . . . d[id] not make that remedy inadequate." *Id.* (internal quotation marks omitted).

The Ninth Circuit's decision in *Guzman* is much the same. There, a deceptive advertising plaintiff brought a claim for damages under the CLRA and a claim for equitable relief under the UCL. The district court dismissed the former as time-barred and, after it did so, dismissed the latter for want of equitable jurisdiction. *See* 49 F.4th at 1311. The plaintiff appealed, arguing that a remedy cannot be adequate if he is barred from obtaining it by the statute of limitations, but the Ninth Circuit rejected that argument, holding that "equitable relief must be withheld when an equivalent legal claim would have been available but for a time bar." 49 F.4th at 1312.

While *Qualcomm* and *Guzman* do not foreclose the possibility that, in cases that are closer to *Stewart*, substantial difficulty in obtaining legal relief can open the door to an equitable remedy, they do mean a plaintiff cannot pursue equitable relief just because he is more likely to succeed in securing the analogous legal relief. Because that is all Betancourt has averred, his UCL claim cannot proceed.

Betancourt cites a number of district court decisions that did not as rigidly enforce this requirement. For instance, in *Martin v. Ford Motor Co.*—another Warranty Regulations case—the district court declined to dismiss the UCL claim because, "to state a claim under the CLRA," unlike under the UCL, the plaintiff had to "prove likelihood of deception." No. CV 20-10365-DMG (JPRX), 2022 WL 2062470, at *5 (C.D. Cal. Feb. 17, 2022). If he failed to do so but still established that Ford's conduct was unlawful, the district court explained, "restitution would be the only remedy." *Id.* This court adopted that reasoning in *Hazdovac v. Mercedes-Benz USA, LLC*, No. 20-CV-00377-RS, 2022 WL 2161506, at *4 (N.D. Cal. June 15, 2022) (relying on *Martin* in denying a motion to dismiss for want of equitable jurisdiction).

Nevertheless, two considerations make both *Martin* and *Hazdovac* inapplicable, or at least

less persuasive, here. First, both cases were decided in the post-*Sonner* fog of uncertainty over the scope of equitable jurisdiction under principles of federal common law. Many more cases from the Ninth Circuit and the Supreme Court will be necessary to delimit fully the outer bounds of that jurisdiction, but *Qualcomm* and *Guzman*—both of which were decided after *Martin* and *Hazdovac*—provide useful initial guidance. That guidance counsels against permitting an equitable claim to proceed simply because there is some difference between the legal and equitable claims that would make the legal claim easier to obtain.

Second, the barrier to obtaining legal relief in *Martin* appears to have been meaningfully higher than it is here. The district court there observed that a showing of "deception" was required to state a claim under the CLRA because of the particular theory of liability the plaintiff advanced. 2022 WL 2062470, at *5. By contrast, Betancourt's theory does not rely on deception. In his original complaint, he simply averred that Mercedes-Benz violated the CLRA by holding out its warranty as legally compliant when it was not. Mercedes-Benz does not dispute that it held out its warranty as legally compliant, so the extra showing required to state a claim under the CLRA appears to be quite trivial: if Betancourt is correct that Mercedes-Benz's warranty was illegal, it follows that its representation was wrong. Thus, it may be that, after *Guzman* and *Qualcomm*, some cases advance a theory of liability that is so incompatible with the CLRA that the legal remedy it provides is inadequate, but this is not such a case.

Betancourt's final argument is difficult to understand. In his briefing, Betancourt asserted that a legal remedy is inadequate so long as it is not asserted in the complaint. However, his counsel did not embrace that (unsupportable) proposition at oral argument, contending instead that the relevance of the decision not to bring a CLRA claim was in what it implied about the nature of the case. Namely, counsel repeatedly insisted that all Betancourt wants out of this case is a legal determination that Mercedes-Benz's conduct was illegal. The problem, of course, is that this framing of the case is belied by the complaint, which seeks restitution in addition to declaratory and injunctive relief. If Betancourt's counsel's interpretation was correct, there would have been no need to request money in any form.

i. <u>The Scope of the Warranty Regulations</u>

The substance of Betancourt's claim fails for a separate reason—the regulations do not cover the piston at issue in this case. Under California law, "[t]he manufacturer of [a] motor vehicle or motor vehicle engine" is required to "warrant to the ultimate purchaser and each subsequent purchaser that the vehicle or engine is . . . [f]ree from defects in materials and workmanship which cause the failure of a [high-priced] warranted part . . . for seven years or 70,000 miles, whichever first occurs." Cal. Code Regs. tit. 13 § 2037(b)(3). For vehicles with a model year of 2008 or later, such as Betancourt's, the definition of a "high-priced warranted part" has three components. First, the part must be "installed on a motor vehicle or motor vehicle engine by the vehicle or engine manufacturer, or installed in a warranty repair." *Id.* § 2035(c)(3)(B). Second, that part must "affect[] any regulated emission from a motor vehicle or engine which is subject to California emission standards." *Id.* Finally, the part must "have an individual replacement cost at the time of certification exceeding the cost limit defined in [Cal. Code Regs. tit. 13 § 2037(c)(3)]," which is equal to consumer price index from two years before vehicle's model year divided by 118.3, all multiplied by 300 and rounded to the nearest ten dollars. *Id.* § 2037(c)(1)(B).

To determine if the allegedly defective engine piston in Betancourt's vehicle had to be covered under the Warranty Regulations, it is first necessary to decide if the piston was "installed *on* [the] motor vehicle or motor vehicle engine." Cal. Code Regs. tit. 13 § 2035(c)(3)(B) (emphasis added). The preposition "on" is key. In common usage, "on" typically connotes a spatial relationship between two things in which the subject is above, or on top of, the object. For example, if someone were to say, "butter is on the bagel," the listener would expect the butter to be smeared *on top of* the bagel, not cooked into the bagel's interior. "On," *Oxford English Dictionary* (2026), https://www.oed.com/dictionary/on_prep?tab=meaning_and_use#33509419. Here, then, a part is only required to be warranted if it is installed in a position putting it in contact with the exterior of the motor vehicle or the motor vehicle's engine. Otherwise, the part has not been installed "on" said vehicle or engine. Cal. Code Regs. tit. 13 § 2035(c)(3)(B).

United States District Court
Northern District of California

Betancourt has not averred that the engine piston was installed "on" the engine (or the motor vehicle itself). That is because the engine piston is, in fact, *an integral part of* the engine. Betancourt concedes as much in his operative complaint. He avers that the piston is a "lubricated sliding shaft that fits tightly inside a cylinder." FAC ¶ 76. In that cylinder, which is itself within the engine, the piston "compress[es] a gasoline-air mixture." *Id.* That mixture is ignited by a small explosion within the cylinder, and the piston then "transfer[s] the force generated by the small explosion into energy," powering the engine and, ultimately, the vehicle. *Id.* The piston is thus key to making the engine function; it is not an adjacent component sitting on the engine's exterior.

Betancourt resists this conclusion on several bases, but none are persuasive. First, he argues that the ordinary meaning of "on" produces absurd results. It is certainly true that construing "on" to mean "in contact with the exterior of" will limit the number of automobile parts subject to the warranty requirement, but there is nothing absurd about that. Following the plain text where it leads still results in plenty of automobile parts—such as the exhaust gas recirculation valve and the positive crankcase ventilation value—manifestly covered by the Warranty Regulations.

The absurd result about which Betancourt worries appears to relate to the construction of the phrase "in a warranty repair." Cal. Code Regs. tit. 13 § 2035(c)(3)(B). That is, he fears that assigning the word "on" its plain meaning will require the same for the word "in," which in turn will make that phrase nonsensical. *See* Opp. at 3 ("for the purpose of this provision, the words 'in' and 'on' cannot be interpreted literally; otherwise, the phrase 'installed *in* a warranty repair' (emphasis added) as used in Section 2035(c)[3](b) would not make sense."). However, "on" and "in" are different words with different meanings. The plain language of "in" includes one defined by spatial relationships, similar to the word "on"—namely, "in" can mean "contained within." However, it can also mean "during"—as in, the football player was injured in the game. This is how "in" is used in Section 2035(c)(3)(b). The component qualifies as a "warranted part" if it was installed "during" a warranty repair (assuming the other requirements are also satisfied). Adopting the natural definition of "on" in section 2035(c)(3)(B) does not call that into question.

United States District Court
Northern District of California

Betancourt also contends that Mercedes-Benz's construction of section 2035(c)(3)(B) is foreclosed—or at least sufficiently called into question—by the declaration of Allen Lyons, who was the Chief of the Emissions Certification and Compliance Division (CARB). CARB promulgated the regulations at issue in this case and is responsible for enforcing them. The Lyons Declaration states that it was prepared "for the sole purpose of educating the Court about CARB's interpretation and implementation of California's warranty requirements." Dkt. 43, Ex. 1 (Lyons Dec.) ¶ 2. As to the definition of a "warranted part," the Lyons Declaration explains that "[w]arranted parts include any components that can or are required to illuminate the [on-board diagnostics] Malfunction Indicator Light (MIL) in the event of a malfunction." *Id.* ¶ 7. It goes on to say "[o]ne specific type of warranted part is an 'emissions-related part,'" which includes those parts specified in the "'Emissions-Related Parts List,' adopted by the State Board on November 4, 1977, as amended June 1, 1990." *Id.* ¶ 8.

The Lyons Declaration is unpersuasive for several reasons. First, though it is presented as a declaration, it does not declare any facts at all. It offers a legal opinion on the meaning of a term used in the regulations. In truth, the declaration is more like an amicus brief—it offers the perspective of a non-party on the best way to resolve a contested question in this case.

It does not matter that Betancourt incorporated the conclusions of the Lyons Declaration into the averments in the complaint. A plaintiff cannot survive a motion to dismiss on a dubious legal theory by averring that his theory is viable as a matter of fact. That is a question for the court and for which plaintiff gets no deference, even at the motion to dismiss stage.

Second, the Lyons Declaration's definition of a "warranted part" is wholly atextual. Its reference to the Malfunction Indicator Light stems from section 2037(b)(2), which requires the vehicle manufacturer to warrant that the vehicle and engine are:

> Free from defects in materials and workmanship which cause the failure of a warranted part to be identical in all material respects to the part as described in the vehicle or engine manufacturer's application for certification, including any defect in materials or workmanship which would cause the vehicle's on-board diagnostic malfunction indicator light to illuminate

Cal. Code Regs. tit. 13 § 2037(b)(2). As opposed to the Lyon's Declaration, section 2037(b)(2)

uses illumination of the malfunction indicator light to define which defects are sufficiently serious to implicate the warranty, not the parts in which those serious defects must arise. The warranty requirement does not extend to non-warranted parts, even if a defect in such a part causes the malfunction indicator light to illuminate.

The Lyons Declaration's position that every "emissions-related part" is a "warranted part" is equally without a basis in the text. To repeat, the provision applicable to Betancourt's vehicle, section 2035(c)(3)(B), does not use the phrase "emissions-related part" or the "Emissions Warranty Part List" in defining "warranted part."

Perhaps the Declaration is thinking of an adjacent provision, section 2035(c)(3)(A), which does define "warranted part" as, in relevant respect, "any *emission-related part* installed on a motor vehicle or motor vehicle engine by the vehicle or engine manufacturer, or installed in a warranty repair, which is included on the '*Emissions Warranty Parts List*' . . ." Cal. Code Regs. tit. 13 § 2035(c)(3)(A) (emphasis added). However, that provision applies only to vehicles with a model year between 1979 and 1989 or with a model year after 1990, but which were produced before January 24, 1991. Betancourt's vehicle does not qualify. That CARB used the phrase "emissions-related part" and incorporated the Emissions Warranty Parts List in an adjacent provision but did not in the operative provision strongly suggests they were never meant to be a part of the operative provision's definition. CARB knew how to incorporate them—if it wanted to do, it would have.

Betancourt also argues that the Mercedes-Benz's reading of the Warranty Regulations are contradicted by CARB's Initial Statement of Reasons for Proposed Rulemaking 2006 (ISOR). The ISOR states that "under the 'defects' provision [Section 2037], vehicles that have defects in *emission components* or that cause the [malfunction indicator light] to illuminate would also be repaired by the manufacturer for 3 years/50,000 miles." *See* FAC ¶ 84 (emphasis added). Betancourt's argument implies that the phrase "emission components" is coterminous with the phrase "warranted part," but that argument is question-begging. Even if CARB was using the phrase "emission components" as shorthand for those parts covered by the Warranty Regulations,

the question still remains: What is an "emission component"? The ISOR does not seem to propose an answer, and the best one based on the text is that an "emission component" is just any component that satisfies the definition of a "warranted part." That is, it must *both* affect regulated emissions *and* be installed on a motor vehicle or a motor vehicle engine.

Moreover, this sort of evidence is simply not enough to overcome the plain language of the text. There is a process for promulgating regulatory language which includes input from regulators, experts, the regulated community, and other stakeholders. The agency cannot just change the regulatory language through unilateral pronouncements about what the regulations mean.

B. Standing to Seek Prospective Relief

In addition to equitable restitution, Betancourt seeks injunctive relief under the UCL requiring Mercedes-Benz to comply with the mandatory warranty provisions. Because injunctive relief exists to ameliorate prospective harm, a plaintiff must establish that he is "likely to suffer future injury" in order to obtain it. *City of Los Angeles v. Lyons*, 461 U.S. 95, 105 (1983).

Betancourt identifies two prospective injuries that he contends support injunctive relief. First, he claims that absent injunctive relief, Mercedes-Benz will continue to fail to warrant engine pistons. Without warranty coverage, vehicle owners will be less likely to have the pistons repaired when they fail, which, in turn, will cause environmental damage from inefficient engine mechanics. Second, he avers that he "faces a threat of imminent or actual harm by not being able to rely on [Mercedes-Benz]'s representations regarding Emissions Warranty coverage in the future." FAC ¶ 187. Specifically, Betancourt avers that he is in the market for another Mercedes-Benz vehicle and "[a]bsent injunctive relief, [he] will not know whether it makes sense to spend money on another [Mercedes-Benz] vehicle in the future on account of [Mercedes-Benz]'s noncompliance with the Emissions Warranty." *Id.*

The first purported injury is insufficient to support standing to sue. It is axiomatic that a plaintiff can only sue on account of an injury that is particularized to him. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). A "generalized grievance[]"—one shared equally among all

citizens—is not enough. *See United States v. Richardson*, 418 U.S. 166, 175 (1974). Yet that is exactly what this is. Betancourt worries that Mercedes-Benz's conduct will damage the environment, but he will experience that damage in a completely undifferentiated manner from his fellow citizens. Therefore, he cannot sue to prevent it. *See Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 477 (D.C. Cir. 2009) (characterizing injury from climate change as merely a "generalized harm" insufficient to support standing).

Betancourt protests that this theory of environmental harm is identical to that which survived a motion to dismiss in *Hazdovac*, *see* 2022 WL 2161506, at *4 (N.D. Cal. Feb 16, 2022), but that is not quite right. There, this court rejected Mercedes-Benz's argument that environmental harm was not sufficiently "real []or imminent." *Id.* It explained that, for purposes of a motion to dismiss, it was required to accept the plaintiff's well-pleaded averment that some Mercedes-Benz owners will fail to fix their vehicles without warranty coverage, leading to more environmentally hazardous cars on the road. *See id.* However, an injury can be real and imminent yet still fail to support standing to sue because it is shared by the public at large. This court did not assess particularity in *Hazdovac*, so it is of no value on that point.

Betancourt's second theory of injury fares no better. Betancourt claims that he is in the market for a new Mercedes-Benz and would like to purchase one but cannot do so in good faith because he cannot rely on Mercedes-Benz's representations about the warranty. This theory of prospective injury draws on an analogy to the law of false advertising. In *Davidson v. Kimberly-Clark Corp.*, the Ninth Circuit held that a consumer that had *already* been deceived by a false advertisement may have standing to seek an injunction requiring the defendant to correct the advertisement going forward. *See* 889 F.3d 956, 969 (9th Cir. 2018). In some cases, the court explained, the impending injury giving rise to standing will be "the consumer's plausible allegations that she will be unable to rely on the product's advertising or labeling in the future, and so will not purchase the product although she would like to." *Id.* at 969–70.

Though Betancourt presents his injury as like that endorsed in *Davidson*, they are, on closer examination, quite different. The panel in *Davidson* held that this type of injury is

cognizable because a consumer "is entitled to rely on the statements made [by the seller], even if he previously learned that some of those statements were false or deceptive." 889 F.3d at 968–69 (quoting *Weidenhamer v. Expedia, Inc.*, No. C14-1239RAJ, 2015 WL 1292978, at *5 (W.D. Wash. Mar. 23, 2015)). If the consumer does rely on the seller's statements, and they turn out still to be false, she has suffered a cognizable injury—namely, the harm of being deceived into purchasing a product different from that promised. The concrete injury, therefore, happens at the point of sale. To show that she faces a substantial threat of incurring that injury, the consumer must merely aver that she would like to purchase the product and that the seller has yet to correct the falsity in the advertisement.

Therein lies the difference. Unlike the consumer in *Davidson*, there is no prospect that Betancourt will suffer an injury at the point of sale. That is because Mercedes-Benz is not deceiving anyone. It is transparent about which components are covered by the vehicle's warranty, and the consumer knows what he is buying. The concrete injury comes much later—when the piston breaks down and the vehicle owner is denied warranty coverage.

As a result, it is not enough that Betancourt is presently in the market for a new Mercedes-Benz. The prospect that he might soon buy a vehicle subject to Mercedes-Benz's view of its obligations under the Warranty Regulations is just the first step in a lengthy chain of events that would have to unfold for a cognizable injury to mature. Most importantly, the piston would still have to become defective in a manner and within a timeframe implicating the Warranty Regulations. Betancourt has offered nothing to suggest that is likely, so the ultimate injury—being denied warranty coverage for a defective piston—is not "certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013). Consequently, Betancourt lacks standing to seek an injunction.

Because Betancourt lacks standing to seek injunctive relief, he lacks standing to seek a declaration that Mercedes-Benz's ongoing conduct violates the Warranty Regulations. *See Lyons*, 461 U.S. at 99–100 (holding that a plaintiff must aver that a prospective injury is imminent to obtain injunctive *and declaratory* relief); *Golden v. Zwickler*, 394 U.S. 103, 109 (1969) (holding

that a former Congressman could not seek a declaration that a New York statute prohibiting anonymous handbills directly pertaining to election campaigns was unconstitutional because "it was most unlikely that the Congressman would again be a candidate for Congress," and thus his injury lacked "sufficient immediacy and reality").

## IV. CONCLUSION

For the foregoing reasons, Mercedes-Benz's motion to dismiss is granted. Because the basis of the dismissal is jurisdictional, it is without prejudice. *Guzman*, 49 F.4th at 1314 (requiring dismissals for lack of equitable jurisdiction to be without prejudice); *Frigard v. United States*, 862 F.2d 201, 204 (9th Cir. 1988) ("Ordinarily, a case dismissed for lack of subject matter jurisdiction should be dismissed without prejudice so that a plaintiff may reassert his claims in a competent court.").

**IT IS SO ORDERED**.

Dated: August 13, 2026

RICHARD SEEBORG
United States District Judge